## COMMONWEALTH *v.* BURRELL.

A writ of *quo warranto* does not lie except at the suggestion of the attorney-general against one holding the office of Judge of a court of Common Pleas.

This remedy, at the suggestion of an individual, is confined to the cases specified in the act of 1836, sect. 2, which are in the nature of private injuries. In other cases, as where a franchise of the Commonwealth is usurped, or an office held which can only be legally filled by appointment of the Governor or the election of the people, the remedy is exclusively on the suggestion of the attorney-general or his deputy ; nor can an individual use the name of the attorney-general on his own motion.

A *quo warranto* issued upon the suggestion of Edgar Cowwan, setting forth the appointment of Thomas White to the office of President Judge of the Tenth Judicial District, and that his term of office expired under the constitution on the 27th of February, 1847. That at that time the Senate was in session, and so remained until the 16th March following. That during that period no lawful appointment was made to fill the same. And although the Senate had refused its advice and consent to the appointment of Jeremiah M. Burrell, esquire, before the close of its session, nominated by the Governor as President Judge, &c., yet the Governor notwithstanding, after the close of the session on the 25th March, 1847, by his commission of that date, granted to the said J. M. B. the said office, &c.,—this was signed and sworn to by the relator alone.

*McCandless* now moved to quash the writ, on the ground that the defendant was not bound to answer the suggestion of an individual: Rex *v.* Carmarthen, 2 Burr. 869 ; 2 Lord Raym. 1409 ; Nevill and Payne's case, Cro. Eliz. 304 ; King *v.* Ogden, 10 Barn. & Cress. 230 ; 5 Mass. Rep. 230 ; 10 Mass. Rep. 290 ; 1 McCord, 52 ; 2 Halst. 102 ; 16 Serg. & Rawle, 140 ; 9 Ann. c. 20 ; Wallace *v.* Anderson, 5 Wheat. 291 ; Cole on Inform. and Quo War. 169, 56 Law Lib. ; 5 Johns. Ch. Rep. 381.

*Williams,* contrà, cited 2 Rawle, 381 ; 2 Dall. 112 ; 3 Dall. 490 ; 3 Serg. & Rawle, 29, 52 ; 15 Serg. & Rawle, 131 ; 10 Mass. Rep. 291. He further prayed to be permitted to amend by inserting the name of the attorney-general.

GIBSON, C. J.—In Heydon's case, 3 Rep. 7, the judges resolved that the true way to arrive at a sound construction of a doubtful statute, is to consider the old law, the mischief, the remedy, and the *true reason* of the remedy ; and it was said in Stowell *v.* Zouch, Plowd. 364, 365, as well as in Miles *v.* Williams, 1 P. Wms. 252, that

the safest way is to interpret statutes as near as may be to the common law, and by the course it observed in cases of its own, before the act. Such being a cardinal rule of construction, by which the sages of the law have ever been guided, it is proper to premise that as we never had, strictly speaking, any previous statute on the subject of *quo warranto*, the remedy stood with us on the foot of the common law, modified, in a measure, by our own customs, partly founded in analogies drawn from the 9 Anne, c. 20, which, however, was not extended as a statute to Pennsylvania. What then was the old law ?

The great English commentator tells us that the writ of *quo warranto* lies, at the common law, for the usurpation of a franchise in violation of the right of the king; and that it is in the nature of a writ of right for the king : consequently, that no one but the officer of the king can sue it out. That certainly was the law of the olden time. The judgment on it was conclusive of the right, even against the king ; and that, together with the slow and unwieldy march of the remedy, made it give place in practice to the more simple and less decisive method of prosecution by information, in the nature of a *quo warranto*, filed by the attorney-general in the King's Bench. Thus stands the common-law proceeding in that court. In our own, the common-law writ of *quo warranto* was not attempted; but, in place of it, recourse was had to the information in the nature of a *quo warranto*, pretty much as it stands in England at this day, notwithstanding the tenth section of the ninth article of the constitution, which declares, that " no person shall, for any indictable offence, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia when in actual service, or in time of war or public danger." In The Commonwealth *v.* Browne, 1 Serg. & Rawle, 382, it was held that an information in the nature of a *quo warranto*, being not a criminal but a civil proceeding, to try a right, was not within the constitutional prohibition. Though this decision was unquestionably founded on a sound construction, it still appeared to be not entirely reconcilable to the letter of the constitution.

These informations in nature of *quo warranto* were found to be so convenient in England, that they were allowed by the 9 Anne to be filed by leave of the court at the suggestion of a corporator, for the determination of disputes growing out of corporate rights, in which the prerogative of the crown was not involved; not, however, in the name of the attorney-general, but in the name of the master of the crown office. That statute, as I have said, was not

extended to Pennsylvania by adoption, and ratified by our act to name the laws in force at the Revolution; but the substance of it had been adopted as a part of our own common law.

Thus stood the law of Pennsylvania at the enactment of our statute; and what were the defects in it which were proposed to be remedied?

Though we are bound to take our positive law from the statute-book, we are at liberty, in doubtful cases, to go behind the curtain for the motives of the enactment; and haply we have not, in this instance, to deal with probabilities or conjectures. The defects pointed out by the commissioners were want of authority to give speedy remedy by *writ*, not only in cases at the common law, but in cases identical with, or similar to, those provided for by the statute of Anne; want of power in the Supreme Court to try issues of fact in the country; and the delay incidental to confining the remedy in all cases to a single tribunal. Did the legislature intend to do more than supply them?

The statute gives the Supreme Court power not only to proceed by writ, but to send issues to the county courts in cases of which it has exclusive jurisdiction; and for greater despatch, to give those courts concurrent jurisdiction in cases of usurpation, or forfeiture of county, township, or corporate franchises, offices, or liberties; but the commissioners proposed no allowance of the writ at the suggestion of a relator. That was added while the bill was under discussion, but limited, as we shall see, to county court cases. The bill was reported on the basis of the common law, by which the attorney-general is the organ of prosecution, and the exception was introduced by the legislature in juxtaposition with, and as part of, the provision for private rights with which that officer and the public have no concern.

The first section of the statute declares, that " writs of *quo warranto* may be issued by the Supreme Court in the *form* and *manner* hereinafter provided, in all cases in which the writ of *quo warranto* at common law may have been issued, and in which the said court may have heretofore possessed the power of granting informations in nature of such writ;" and consequently in a case like the present. What was meant by the words *form* and *manner*, I will presently attempt to make plain.

So much of the second section as gives rise to the question, is in these words: " Writs of *quo warranto* in the manner and form here-inafter provided, may also be issued by the several Courts of Common Pleas concurrently with the Supreme Court, in the following

cases, to wit: 1. In case any person shall usurp, intrude into, or unlawfully hold or exercise, any *county* or *township* office within the respective county. 2. In case any person duly elected or appointed to any such office, shall have done, suffered, or omitted to do, any act, matter, or thing, whereby a forfeiture of his office shall by law be created. 3. In case any question shall arise concerning the exercise of any office in any *corporation* created by authority of law, and having the chief place of business within the respective county. *And in any* SUCH CASE, *the writ aforesaid* may be issued upon the suggestion of the attorney-general, or his deputy, in the respective county, (or of any person or persons desiring to prosecute the same.)"

Now what are we to understand by the words "any such case?" Upon every principle of grammatical relation and obvious meaning, we must intend that the legislature had in view the cases specified in the same section immediately preceding the final clause. It was of these it had been speaking, and it was of these it was continuing to speak. The words in brackets were judiciously added to provide, in imitation of the statute of Anne, for cases in which the public interest might not be involved, and in which the attorney-general might not be willing or bound to prosecute. For all cases within the exclusive jurisdiction of the Supreme Court, the omission of such a provision is proof of a design to leave the impetration of the writ to the regulation of the common law, and consequently to put the control of it exclusively within the power of the attorney-general. And the reason for such a disposition of it is an obvious one. In the usurpation of a municipal or corporate office, or in the retainer of one after forfeiture of it or expiration of the incumbent's term, no franchise or liberty of the Commonwealth is invaded or withheld; and her prerogative is not to be invoked to redress a grievance not her own. But as there may be an invasion of rights of a corporate or municipal nature, it was necessary to introduce the provisions of the statute of Anne, modified and enlarged, for their protection by writ of *quo warranto*, subject, just as the matter stands in that statute, to the direction and control, as well as at the risk and expense of the complainant.

But, by the words of the first section of our act, the writ is to issue from the Supreme Court in the form and *manner* subsequently provided; and hence an argument that the manner has regard to the application for it authorized by the second section. Though the manner of issuing a writ has no necessary connection with the right of the party applying for it to sue it out, which is a

D

distinct thing, the inference would not be without plausibility, if the words could not be satisfied by other provisions to which they are naturally applicable and undoubtedly refer. Following the order of priority, in which the words themselves occur, we have, in the first place, *the form of the writ* specially set down in the fourth section; and in the next we have the *manner* of issuing it presented with equal particularity in the fifth, in which it is said: "The writ aforesaid may be issued out of the Supreme Court with the leave of the said court in term time, or of any judge, of the said court in vacation; and it is to the same section that the second itself refers for the *manner of issuing* the writ out of the Common Pleas—not to the provision for private prosecution. Can it be doubted, then, that the legislature spoke of this provision, when it spoke, in the first section, of the manner of issuing the writ subsequently provided? The commissioners certainly had reference to it; for they reported the bill without any provision for private prosecution at all; and, if the legislature intended to make their amendment a subject of such reference, it is strange that they did not introduce it among the general provisions of the fifth section, instead of sticking it in among the special provisions of the second for specific cases of a private nature where it might be overlooked.

But it has been said that, as the writ may issue from the Supreme Court in all cases in which informations in the nature of *quo warranto* had been granted, it may issue in the same *manner*, and consequently, at the suggestion of a relator, even without aid from the clause in the second section. But did the court ever allow an information on such suggestion for a *public* wrong? Respublica *v.* Griffiths, 2 Dall. 112, in which the court gave leave to file against a justice of the peace, establishes no such affirmative. That was an information, but not in nature of a *quo warranto;* for it was assumed, on all hands, that the gravamen was a personal tort. The distinction between public and private wrongs was evidently preserved; and the decision is consequently an authority for the motion before us—not against it. Nor was it overlooked in Respublica *v.* Prior, 1 Yeates, 206, in which, also, the information was for a private injury. That the name of the attorney-general was used, proves nothing; for, as we have no master of the crown-office, it was necessarily used in all cases, just as it will have to be used in all cases under our statute. Nor can any adverse inference be drawn from the decision in the Commonwealth *v.* Browne, 1 Serg. & Rawle, 382, that leave to file an informa-

tion in the nature of *quo warranto* at the suggestion of a relator, was discretionary. That was an information against the collector of a city ward; and the court said that the proceeding, though criminal in form, was essentially a civil one. That was all. The subject before the court was exactly such a municipal case as would now fall within the second section of our statute.

As a remedy for the usurpation of an executive office, or, in other words, an office which can be filled only by appointment of the Governor or by the choice of the people of the state, the statutory writ of *quo warranto* stands, as to every thing but the form of it, as stood the writ of *quo warranto* at the common law. The *projet* of the law, as it was reported by the commissioners, put it on the same footing, even as a remedy for the invasion of a private right; but that there was no design to let a private citizen prosecute for a public wrong, is plain from the third section, which commands the attorney-general to file the suggestion and prosecute the writ where an unchartered association shall have usurped the Commonwealth's franchise by acting as a corporation. On the usurpation of a municipal or corporate *office*, as I have said, no franchise or exclusive right of the Commonwealth is invaded; and the intervention of a private prosecutor was extended to it, but not as a remedy for a public wrong. The Commonwealth has her own officer for the protection of her own rights; and, as she has not explicitly allowed his office to be assumed by any one who may please to try his hand at the business of prosecution as his self-constituted *locum tenens*, we dare not assume the power to allow it. In Rush *v.* Caveneaugh, 2 Barr, 189, it was said that, as the office of the attorney-general is a public trust, which involves the exercise of an almost boundless discretion by an officer who ought to stand as impartial as a judge, it might be doubted whether even counsel employed by a private prosecutor should be heard; but that private counsel could, at most, be allowed to act by his permission and under his control. What impartiality is there to be expected from a private prosecutor flushed with the excitement of party victory or defeat? The officer acts under the obligation of an oath, and at the peril of impeachment; a private prosecutor, under no obligation or responsibility at all; yet we are called upon, without any clear warrant, to let him wield at will the tremendous power of public prosecution. The old common-law right of prosecuting the higher felonies by appeal, which had sprung from a barbarous state of society, was left by our ancestors in the lumber garrets of the law at home; yet there is as much reason

that a champion should be at liberty to enter the lists with a traitor as that a private citizen should be at liberty to close in legal conflict with the usurper of a public office.    In the other cases of appeal, the felony was attended with private injury, and there was therefore some show of reason that it should be avenged by the sufferer or a friend ; in a case like the present, there was neither an appeal nor an apology for one.    The law-officer of the crown was sufficiently prompt then ; and why should action *ab extra* be invoked now ?    These are not the days to encourage individuals, or the masses, to snatch the reins from the constituted organs of the government ; and did the question before us even admit of a latitude of construction, I would certainly lean to the conservative side of it.    Astounding results proceed from small beginnings ; and we have already beheld appalling scenes enacted in our commercial emporium with impunity, and almost without resistance, by men who took the law into their own hands in the name of the people.

What induces the mind to pause, not as to the soundness of this conclusion, but as to the policy of the law, is the consideration that, as the governor controls the action of the attorney-general who is dependent on him for office, an unconstitutional appointment by the executive might be without remedy were his legal adviser in error, or regardless of his duty.    But the same dependence on the predominance of a party must be felt, place the power of appointment where we may.    In other words, a work of human hands is never perfect ; but it is better to bear the ills we have than fly to those we know not of.    The legal presumption is, that an officer will do his duty ; or that if he do not, the representatives of the people will impeach him, and the senators convict him.  The American who denies it, denies a political aphorism, that public virtue is the basis of a republic, and one that is a postulate of his own government.    If the presumption is false, it was the business of the convention which framed the constitution on that basis without providing counter-checks to the disturbing forces of party conflict, or of the legislature which framed the statute before us, to dispose of the fallacy.    It is our business not to dislocate the joints and articulations of the government, to correct errors of legislation, whether immediately by the people or by their representatives ; but to pronounce the law as we find it.   "Contrary to the spirit and policy of the act," said Lord Mansfield in Rex *v.* Saint Peter and Saint Paul, 1 Bott. 433, pl. 483, "and not obliged by the letter, the court will not make an exception of a case which the act

itself has not excepted." Did we except the present case, we would legislate—not adjudicate. We would deprive the attorney-general of his official discretion, and compel him to act against the dictates of his judgment, perhaps not, as in this instance, at the bidding of a respectable lawyer, but at the bidding of the most ignorant and despicable man in the community. If a *primâ facie* case were suggested, however notoriously unfounded in fact, the court would be bound to allow the writ without regard to the respectability of the relator. A curious means of procuring the action of the public law officer was used in the Commonwealth *v.* Fowler, 10 Mass. 290—a case very much like the present. To know by what authority the respondent exercised the powers of a judge in Massachusetts, the House of Representatives of that state ordered the attorney-general, or the solicitor-general, to file an information against him in the nature of a *quo warranto*. The solicitor-general filed such an information, but recited the order of the House on it, and declared that he had acted in obedience to it. On a motion to quash, the question was, whether the information was the act of the officer or of the House; and the court very properly held that, as he was bound to act on his own responsibility, the act was his own, and the recital surplusage.

It is needless to say that, had it been deemed the act of the House, it would have been quashed, as a legislative usurpation of his function. To say no more of that, the decision shows that, in the absence of specific enactment, a case like the present stands on the regulation of the common law. But it is very far from clear that a greater degree of inconvenience than arises from it, would not arise from exposing every officer to a writ of *quo warranto* at the suggestion of any person disobliged by him in discharging his duty. As the judgment in a previous instance might not bar another prosecution by a new relator, the incumbent might be plagued to death. In the Commonwealth *v.* Darlington, who died before judgment, and in the Commonwealth *v.* Collins, 8 Watts, 331, in which there was judgment of ouster, the writ issued at the suggestion of the attorney-general. The bill reported by the commissioners was based on the law as it stood; and the amendment of it was limited to specific cases, and, as the present is not one of them, it would be reached only by a writ issued by the attorney-general.

Writ quashed.