## Kaufman, Appellant, v. Pittsburg & Castle Shannon Railroad Company.

*Railroads—Lease—Power to lease—Act of May 25, 1871, P. L. 1170.*

A railroad company incorporated under the general railroad Act of April 4, 1868, P. L. 62, with additional powers, enabling it to own and operate coal mines, conferred by the special Act of February 21, 1872, P. L. 142, and to construct and operate inclined planes by a special Act of April 5, 1873, P. L. 546, may lease its railroad to a railway company organized with omnibus powers under the special Act of May 25, 1871, P. L. 1170.

If a railroad company has the chartered power to construct a railroad for another company to operate, and to operate a railroad for itself, it has the power to lease a railroad for its own use for a term of years. The power to purchase outright includes the power to lease and operate for a definite term. The greater includes the lesser power.

The question whether the legislature was improvident in conferring omnibus powers upon certain corporations chartered by special acts during the legislative sessions of 1870 and 1871, is a legislative, and not a judicial, one.

The general railroad Acts of April 23, 1861, P. L. 410, and February 17, 1870, P. L. 31, requiring the railroads of a lessor and lessee to be "connected," do not apply to the Act of May 25, 1871, P. L. 1170.

Where a railroad company under its act of incorporation has the power to take a lease of the property of another railroad company, and there is no limitation on the power of the second company to enter into the lease, the second company has an implied power to make the lease in question.

Argued March 5, 1907.    Appeal, No. 40, Oct. T., 1907, by plaintiff, from decree of C. P. No. 1, Allegheny Co., Sept. T., 1905, No. 839, dismissing bill in equity in case of Sibilla Kaufman v. Pittsburg & Castle Shannon Railroad Company, Pittsburg Railways Company et al.    Before MITCHELL, C. J., BROWN, ELKIN and STEWART, JJ.    Affirmed.

Bill in equity for an injunction.

MACFARLANE, J., found the facts to be as follows:

1. The Pittsburg & Castle Shannon Railroad Company, hereinafter called the railroad company, is a corporation organized under the general railroad Act of April 4, 1868, P. L. 62, and having by the special Act of February 21, 1872, P. L. 142, the right to own real estate and mine coal therefrom, and by the special Act of April 5, 1873, P. L. 546, the right to construct an incline plane. The plaintiff was in August, 1905, and still is the owner of fifty shares of stock of the said company.

2. The Pittsburg Railways Company, hereinafter referred to as the railways company, was incorporated by a special Act of assembly, May 25, 1871, P. L. 1170, under the name of the "Surety Contract Company," subsequently changed to the present name, and its principal business is that of operating traction lines and passenger railways in the county of Allegheny.

3. The Pittsburg Coal Company, hereinafter referred to as the coal company, is a corporation under the laws of the state of New Jersey, having its principal office in the city of Pittsburg, Allegheny county, and is engaged extensively in the

mining and selling of coal in the said and adjacent counties; and it is the owner of 7,756 shares of the stock of the Pittsburg & Castle Shannon Railroad Company, out of a total of 9,628 shares.

4. The board of directors of the railroad company, ten in number, is with one exception composed of officers and directors of the coal company, and the railroad company has been for several years controlled and managed by the coal company.

5. The executive officers of the railroad company, its superintendent, engineer and accounting officers, were officers in a similar capacity of the coal company, which charged the railroad company for their services a reasonable amount, and the operating expenses of the railroad company were, in this respect, much less than they would have been if independently officered.

6. The railroad operated by the railroad company extends from Arlington Station, Scott township, Allegheny county, to a point on Bailey avenue in the thirty-second ward in the city of Pittsburg, and then by an incline plane with the road running from Bailey avenue to Carson street in the city of Pittsburg. It also owns and operates coal mines in Scott township. Prior to January 1, 1893, the railroad ran by a horseshoe curve track north of Washington avenue, in the thirty-second ward, in the city of Pittsburg, via a coal tunnel and coal incline to Carson street in the thirtieth ward, Pittsburg, where there was and is now located a coal yard of the railroad company. About the last mentioned date the company constructed a shorter and more direct line diverging from the former route at a point near Washington avenue, in Montooth borough, and by incline planes reaching Carson street at a point adjoining the coal yard. Upon the completion of the new short line the horseshoe curve track, coal tunnel, etc., were used solely for the transportation of coal from the mines of the company to the yard, and were not used for the transportation of freight and passengers, except on several occasions prior to the year 1900, passengers were so transported on account of accidents to the incline planes on the shorter route, which from January, 1893, was used exclusively for passengers and freight and became the main line of the railroad. The horseshoe curve portions of the track were

used in connection with the coal yard as a part of the terminal facilities of the railroad company in its mining and shipping of coal.

7. On July 13, 1904, the railroad company leased to the coal company, at $30.00 a month, for the term of three years from July 1, 1904, a lot which had been used as a dump for refuse, and the coal company erected thereon a laboratory for its use and the use of the railroad company.

8. For some time prior to any negotiations for the lease in this case, the coal company had erected telephone wires, at its expense, along the right of way of the railroad, and this line was used by the coal company and the railroad company without charge to the latter.

9. The coal company has, and has had, no agreement or understanding with the railroad company for the use of the horseshoe curve portion of the tracks, and has not, at any time, used these tracks or any part thereof, and it does not own, control or operate in any way any mines or other property on or near the line of the railroad company.

10. The railroad company was, in August, 1905, and had been for several years previous, insolvent. Its coal property was valuable and was capable of being operated with profit, but the railroad had for a long time been operated at a loss of more than $3,000 a month, which was almost an offset to the earnings of the coal business of the company.

11. During the months of July and August, 1905, the railroad company began negotiations with one Baxmyer for the lease of the railroad, and a meeting of the stockholders of the railroad company was called on August 16, 1905, for the purpose of considering a proposition for the leasing or selling of certain of its property, and there was then presented to the stockholders a resolution authorizing the execution of a lease and it was then stated that the proposed lessee was the railways company, and that the proposed lease was in pursuance of a resolution of the board of directors, made on July 21, 1905. Objections were made by some of the stockholders, including the plaintiff, and a verbal offer was made to take a lease at the rent of $20,000 per annum. The meeting adjourned to August 17, at which time William Kaufman, acting on behalf of a principal whose name he refused to disclose, but with whom

the plaintiff had no privity, but who was, some time after the execution of the lease, disclosed to be Robert C. Hall, a broker and promoter, of the city of Pittsburg, offered in writing that he, Kaufman, would, on or before August 24, bid at least $17,500 for the lease in the same form as that submitted, and as evidence of his good faith he deposited three bonds of $1,000 each. The meeting was adjourned to August 24, at which time Kaufman did bid $17,500 per annum for the lease for a term of ninety-nine years, and for a further term of ninety-nine years at $20,000 per annum. This bid was in writing. The said bid was not submitted for the consideration of the stockholders, for the reason that the identity of the principal was not disclosed, although demanded, and it appeared on the bid that there was no corporation competent to take the lease; and it was known by the directors and by the plaintiff and most of the stockholders present that the railways company was ready and willing to execute the lease, and that it was a strong corporation, of a good credit, and capable of carrying out the terms of the lease.

12. The action of the coal company as a majority stockholder, and of the officers of the railroad company, in voting for the lease and in subsequently executing it, was prudent and in good judgment and was advantageous to all of the stockholders, and the refusal of the Kaufman bid was in good faith and in the exercise of good judgment. It developed upon the trial of this case that Mr. Hall had no connection with or control over any corporation capable of taking a lease, and his purpose in desiring to acquire the lease was simply as a speculation.

13. At the last mentioned meeting an election was had upon the proposed lease. The coal company cast its stock in favor of the resolution, and out of a total of 9,628 shares 8,153 shares were cast in favor to sixty-six against the resolution, the affirmative vote being composed of the stock of the coal company and its officers, directors and employees, with the exception of 350 shares, and of the sixty-six shares, fifty were owned by the plaintiff and sixteen by E. F. Hays.

14. Neither the coal company nor any of its officers nor any of its subsidiary companies or their officers have received or will receive any pecuniary or other benefit or advantage in

consideration of voting its stock in favor of the lease, except such benefits and advantages as accrue equally to all of the stockholders of the railroad company.

15. The lease dated August 25, 1905, was executed for the railroad company by its president on the morning of August 25, and by its secretary in the evening of that day, and was executed by the railways company on August 26; and as early as 12 : 25 P. M. August 25, notice was served upon the railways company by plaintiff, requiring the defendant not to execute the lease or to pay out any money on account thereof. This bill was filed on August 30 and served the same day. The railways company entered into possession, and since that time has been operating the portion of the railroad leased to it.

16. On or before September 1, 1905, the railroad of the defendant railroad company did not connect with nor intersect any other railroad nor physically with the road or railway of any street railway company, and the railways company did not own, control, lease or operate a railroad physically connected with that of the railroad company. The railways company's tracks are situated, with reference to the railroad company's tracks, at a number of points, as follows : at Carson street within sixty feet, at which point passengers have been for several years transferred between the respective companies under the terms in an agreement; on Bailey avenue, within four or five feet; near Arlington avenue the railways' tracks cross the railroad above grade; the Washington avenue line parallels the railroad for more than a quarter of a mile, at a distance from twenty to sixty feet; at another point the lines are 150 feet apart, and the intervening land is leased by the railways company; from Arlington to Castle Shannon the lines parallel for about half a mile, at a distance from twenty-five to 200 feet; and in Castle Shannon a spur of the railroad extends to within ten feet of the railways' tracks. At all but one of these points the transshipment of passengers from one road to the other is easy and convenient.

CONCLUSIONS OF LAW.

1. There being no fraud or undue advantage, the lease is not void on that ground.

2. The lessor has not violated any duty to the commonwealth.

3. The lessee has the right to take the lease.

4. The lessor has the right to make the lease.

5. It is not necessary under the charter of the lessee that the lines be mechanically connected, and it is sufficient that they are in proximity so as to afford convenient transfer of passengers.

6. The bill should be dismissed at the costs of the plaintiff.

*Error assigned* was decree dismissing the bill.

*Wm. Kaufman,* with him *E. F. Hays,* for appellant.—The lease is ultra vires as to defendant Pittsburg & Castle Shannon Railroad Company: Bly v. White Deer Mountain Water Co., 197 Pa. 80; Schroeder v. Gas & Water Co., 20 Pa. Superior Ct. 255; Van Steuben v. R. R. Co., 178 Pa. 367; Pittsburg, etc., Railroad Co. v. Railroad Co., 196 Pa. 452; Penna. R. R. Co. v. Bridge Co., 131 U. S. 371 (9 Sup. Ct. Repr. 770); Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24 (11 Sup. Ct. Repr. 478).

The defendant railways company and the defendant railroad company are subject to the general laws of the state in force on the date of their incorporation, including the general railroad act of 1868, and the railroad leasing acts of 1861 and 1870: Penna. R. R. Co. v. Kelly, 31 Pa. 372; Penna. R. R. Co. v. Duncan, 111 Pa. 352; Penna. R. R. Co. v. Miller, 132 U. S. 75 (10 Sup. Ct. Repr. 34).

The charter of the defendant railways company standing by itself does not authorize it to take the lease; and even if it were so constructed, the lease cannot be held valid if it is ultra vires as to the defendant railroad company: Bly v. White Deer Mountain Water Co., 197 Pa. 80; Schroeder v. Gas & Water Co., 20 Pa. Superior Ct. 255; Pennsylvania Railroad Company's Appeal, 93 Pa. 150; Commonwealth v. Erie, etc., R. R. Co., 27 Pa. 339; Hampe v. Traction Co., 165 Pa. 468.

In this state there have been numerous decisions holding contracts of corporations void because ultra vires as to the powers of one of the parties thereto: Bosshardt & Wilson Co.

v. Crescent Oil Co., 171 Pa. 109; Stewart's App., 56 Pa. 413; Pittsburg & C. R. R. Co. v. Allegheny County, 63 Pa. 126; Pittsburg & Steubenville R. R. Co. v. Allegheny County, 79 Pa. 210; Louisville, etc., R. R. Co. v. Kentucky, 161 U. S. 677 (16 Sup. Ct. Repr. 714); Pennsylvania R. R. Co. v. Bridge Co., 131 U. S. 371 (9 Sup. Ct. Repr. 770); Central Transportation Co. v. Pullman Palace Car Co., 139 U. S. 24 (11 Sup. Ct. Repr. 478).

*David A. Reed*, of *Reed, Smith, Shaw & Beal*, with him *Charles M. Johnston*, for appellees.—Power to take the lease was given by the charter whether or not the railways company had a connecting line: International Navigation Co. v. Com., 104 Pa. 38; Hespenheide's App., 4 Pennypacker, 71; Carothers v. Phila. Co., 118 Pa. 468; Phila. & Erie R. R. Co. v. Catawissa R. R. Co., 53 Pa. 20; Philadelphia v. Philadelphia Traction Co., 206 Pa. 35; Hampe v. Pittsburg, etc., Traction Co., 165 Pa. 468.

Power to make the lease is given by clear implication from the Pittsburg railways charter: In re Prospect Park & Coney Island R. R. Co., 67 N. Y. 371; N. Y. & N. E. R. R. Co. v. N. Y., N. H. & H. R. R. Co., 52 Conn. 274; Hunting v. Hartford St. Ry. Co., 73 Conn. 179 (46 Atl. Repr. 824).

OPINION BY MR. JUSTICE ELKIN, April 22, 1907:

The answer to the third proposition contained in appellant's statement of the question involved will control all the material questions raised by this appeal. Does the charter of the defendant railway company authorize it to take the lease, the execution of which is sought to be enjoined by appellant, and if so, will the lease be held valid for that reason, even though the charter of the railroad company did not in express terms confer the power to enter into such a contract?

The defendant railroad company is a corporation organized under the general railroad Act of April 4, 1868, P. L. 62, and by the special Act of February 21, 1872, P. L. 142, it is given the power to purchase and own real estate and mine coal therefrom. Under the Act of April 5, 1873, P. L. 546, it has the right to construct an incline plane. The learned court below has found as a fact that said railroad company was in August,

1905, and had been for several years prior thereto, insolvent. Its coal property was valuable and was capable of being operated with profit, but the railroad had for a long period of time been operated at a loss of more than $3,000 per month. The railroad company, being desirous of relieving itself from the operation of the road, opened negotiations for the purpose of making a lease of the same for a term of years. Several meetings were held for the purpose of considering a proposition looking to a leasing of the railroad, and on August 24, 1905, the final meeting of the stockholders of the railroad company was held, at which 8,153 shares were voted in favor of the lease and sixty-six against it. The appellant voted fifty shares out of the total of sixty-six against the resolution. The learned court below has found as a fact that the lease was an advantageous one for the stockholders of the railroad company to make, and that there was no fraud or collusion in the transaction. Indeed, we do not understand that the learned counsel for appellant raises any such question on this appeal, but relies entirely on the legal proposition above stated.

The Pittsburg Railways Company derives all of its powers under the special Act approved May 25, 1871, P. L. 1170. This company is one of seven or eight corporations chartered by the legislatures of 1870 and 1871 which have been granted very broad and comprehensive powers. It is clearly within the power of this company to engage in the transportation of passengers and freight by land or water, for it is so expressly written in the act creating it. In section two it is given the power "to build, construct, maintain or manage any work or works, public or private, which may tend or be designed to improve, increase, facilitate or develop trade, travel or the transportation or conveyance of freight, live stock, passengers and any other traffic, by land or water." In section four it is given the power to purchase, make, use and maintain any works or improvements connected or intended to be connected with the works of said company, and to merge or consolidate or unite with said company the improvements, property and franchises of any other company.

It will be observed that this company is given the express power to merge, consolidate or unite with its works or business the improvements, property or franchises of any other com-

pany. It also has the power to purchase, make, use and maintain any works or improvements of another company connecting or intended to be connected with the business of said company. When these general powers are considered in connection with the power to build, construct, maintain or manage any work or works, public or private, intended to improve, increase, facilitate or develop trade, travel or the transportation or conveyance of freight, passengers and other traffic by land or water, conferred by section two, there can be no doubt that the railways company had the power to enter into a contract of lease with the railroad company, under the terms of which it is to use and maintain the property of the railroad company for a term of years at a fixed annual rental agreed upon. It cannot be seriously questioned that the railways company under its charter has the power to build a railroad for another corporation to operate, nor can it be doubted that it has the power to build and operate a railroad for its own use, and it necessarily follows that if it can construct a railroad for another company to operate and can operate a railroad for itself, it can lease a railroad for its own use for a term of years. The power to purchase outright certainly includes the power to lease and operate for a definite term. The greater includes the lesser power.

It may be objected that the legislature was improvident in conferring upon this and the several other companies created by the special acts during the legislative sessions of 1870 and 1871, such omnibus powers, but this is a legislative and not a judicial question. In International Navigation Company v. Commonwealth, 104 Pa. 38; Hespenheide's Appeal, 4 Pennypacker, 71; and Carothers v. Philadelphia Company, 118 Pa. 468, it was held that the rights and franchises granted by these special acts were a valid exercise of the legislative power. In the last case cited it was distinctly held that the power conferred was sufficiently comprehensive to authorize that particular company to engage in the production, distribution and supply of natural gas for fuel.

It seems to be conceded in the argument of the learned counsel for appellant that the railways company has the general power to engage in the transportation of freight or passengers, but it is earnestly contended that the provisions of the

acts of 1861 and 1870, requiring the railroads of a lessor and lessee to be "connected," should apply, and that the lines of the defendant railways company and railroad company do not have a physical connection, and for this reason the lease must fall. In this connection ,it should be observed that the words "connected or intended to be connected," in the act of 1871 which created the defendant railways company, are of much wider significance in the matter of acquiring connecting lines than are the provisions of the general railroad acts referred to. The question involved in this case has nothing to do with the rights or limitations of railroad companies under the general acts of 1861 and 1870. The defendant railways company, in so far as these general powers are involved, looks to the act of its incorporation and is not controlled by the acts referred to. Even under the railroad acts of 1861 and 1870 it has been held that the roads of the lessor and lessee need not be so connected that the same cars shall pass from one road to the other without interruption, but only that they shall be so connected that a convenient interchange of passengers and freight is possible: Philadelphia & Erie Railroad Company v. Catawissa R. R. Co., 53 Pa. 20; Hampe v. Pittsburg & Birmingham Traction Company, 165 Pa. 468. However, it is unnecessary to discuss the question whether the lines of the two companies were so connected as to meet the requirements of the acts of 1861 and 1870, because the rights of the lessor and lessee in this case are controlled by the act of 1871, under which the lessee company was incorporated.

It is now urged, however, that even conceding that the railways company had the power to take the lease in question, the railroad company did not have the power to make it. This does not now seem to be an open question in this state, as it has been expressly held by this court that the power to take, expressly conferred upon the railways company, implies the power in the lessor company to make the lease: Pinkerton v. Pennsylvania Traction Company, 193 Pa. 229. In that case, the present chief justice, speaking for the court, said: "Nor is there any weight in the objection that the passenger railway company had no power to lease its road. The power to take a lease is expressly given to the motor company, and the corresponding power in the passenger railway company, as owners,

to give a lease, is necessarily implied. Without it, the grant in the act would be nugatory." To the same effect are the cases in other jurisdictions: In re Prospect Park and Coney Island Railroad Company, 67 N. Y. 371; N. Y. & N. E. R. R. Co. v. N. Y., N. H. & H. R. R. Co., 52 Conn. 274; Hunting v. Hartford Street Railway Company, 73 Conn. 179.

From the rule stated in these cases it clearly appears that the railways company, under its act of incorporation having the power to enter into the lease with the railroad company, and there being no limitation on the power of the railroad company to enter into the lease, and, therefore, no violation of any statutory requirement, it had an implied power to make the lease in question.

Decree affirmed.